# United States Court of Appeals
## For the First Circuit

No. 02-1688

SECOND GENERATION PROPERTIES, L.P.,

Plaintiff, Appellant,

v.

TOWN OF PELHAM,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul Barbadoro, U.S. District Judge]

Before

Lynch, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

Andrew R. Schulman with whom Getman, Stacey, Tamposi, Schulthess & Steere, P.A. was on brief for appellant.

Diane M. Gorrow with whom Soule, Leslie, Kidder, Sayward & Loughman, P.L.L.C. was on brief for appellee.

December 17, 2002

**LYNCH**, **Circuit Judge**.  In this Telecommunications Act case the plaintiff, a landowner, was denied permission to build a wireless communications tower by the Pelham, New Hampshire Zoning Board of Appeals (ZBA or Board).  The federal district court, on cross motions for summary judgment, rejected the landowner's claims that (1) the ZBA decision was not supported by substantial evidence and (2) the decision was an unlawful effective prohibition on the provision of wireless services.  In doing so, the district court adopted a rule that so long as any carrier provides service in the area, there is never a basis for a claim that a town has effectively prohibited personal wireless service, in violation of the Act, by preventing other carriers from filling a significant geographic gap in their cellular networks.  This holding raises a novel and interesting question.  We disagree with the district court's rule, but affirm on other grounds.

I.

Second Generation planned to build on its land in Pelham[1] a telecommunications tower which would permit carriers to provide service along N.H. Route 128, a state highway.  Pelham has four commercial cell towers, one approved after the ZBA denied Second

---

[1] Pelham, New Hampshire is on the Massachusetts border just north of Lowell, Massachusetts and Dracut, Massachusetts and midway between Salem, New Hampshire and Nashua, New Hampshire.  It lies between Interstate 93 and U.S. 3, the two major north-south highways serving New Hampshire's southern tier.

Generation's first variance application. Pelham has six licensed, operating wireless carriers: Voicestream Communications; AT&T Wireless; Sprint PCS; Verizon; U.S. Cellular; and Nextel Communications (as they are currently known). Cingular Wireless is not among them. Second Generation owns a ninety acre, heavily wooded lot at the top of Seavy Hill (also called Spaulding Hill) directly above a portion of Route 128, which runs through a narrow valley between two ridges of hills. Daily traffic on this portion ranges from 10,000 cars, just south of N.H. Route 111A, to around 4,500 cars, north of Route 111A.

Two wireless carriers, AT&T Wireless and Voicestream, originally committed to use the Second Generation tower, but Voicestream withdrew from its agreement, leaving only AT&T under contract. Two other carriers, Sprint PCS and Nextel, had expressed interest in using the proposed tower.

In 1998, Second Generation applied for a special exception to erect a 400-foot cell tower on Spaulding Hill. The zoning ordinance then provided that communications towers in residential zones were a permitted use, subject to obtaining a special exception. The Zoning Board of Appeals (ZBA) denied the request for a special exception on June 8, 1998. Second Generation appealed to the state Superior Court, which upheld the decision. Second Generation then applied to build a smaller, 250-foot cell tower.

-3-

In March 1999, the town passed a Personal Wireless Services Ordinance which authorizes the town's Planning Board to issue conditional use permits for the construction of cell towers in a newly established "Telecommunications Overlay Zone." The Overlay Zone includes only areas currently zoned for industrial and commercial uses, and is separated from Route 128 by hills. A variance must be obtained from the ZBA to construct a tower outside the Overlay Zone. Since Second Generation's property is in a residential zone, it needed a variance.[2]

In February 2000, Second Generation filed a federal court complaint alleging that the ordinance violated the TCA by effectively prohibiting the provision of personal wireless services, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II) (2000), and unreasonably discriminating against some licensed wireless carriers, in violation of § 332(c)(7)(B)(i)(I). It also brought a claim against the town under 42 U.S.C. § 1983 (2000). The court issued a stay in August 2000 to allow Second Generation to seek a variance from the ZBA.

---

[2] The Planning Board had obtained a legal opinion and public comment, conducted research on limiting cell towers to commercial or industrial zones, and discussed associated technological, economic, safety, and social issues. It met with Blaine Hopkins, Second Generation's expert; Hopkins proposed a multi-district overlay zone, which the board rejected. The Planning Board did not, however, retain its own expert, contact wireless carriers, commission a radio frequency propagation study, evaluate the characteristics of various sites, or attempt to formally assess the quality of existing service.

At the ZBA variance hearing, Second Generation presented testimony from its engineers (one a Voicestream employee), consultants (one from AT&T), attorneys, and its general partner. Representatives of AT&T and Voicestream stated that their networks had coverage gaps on Route 128.[3] Blaine Hopkins, a Second Generation consultant, purported to show that the presence of a cell tower has no impact on property values, and that the alleged gaps could not be serviced by existing Pelham towers or new 190-foot towers in the Overlay Zone. A Second Generation executive testified that the cell tower would generate less noise and traffic than would a single residence, that the surrounding topography would hide the lower part of the tower, and that research by a local appraiser confirmed that the tower would not diminish the value of surrounding properties.

Numerous abutters and other Pelham residents testified that the tower would interfere with their view and spoil the pristine character of the neighborhood. Three abutters said that the tower would diminish property values; one reported that local real estate firms had informed him that the surrounding homes would be devalued by approximately fifteen percent. A ZBA member, also a realtor, strongly criticized the methodology used in Mr. Hopkins's analysis of the impact of cell towers on property

---

[3] The town's planning director acknowledged that her own cell phone did not work on the southern part of Route 128.

values.[4] Two residents contended that the Second Generation property could be put to other uses: for agriculture, residential development, tree harvesting, or elderly housing. One abutter and one ZBA member stated that they had phone service within the alleged gap. A resident also testified that the area could be largely served by a tower in a commercial zone in Dracut, Massachusetts.

The Board voted unanimously to deny the variance on the ground that Second Generation failed to prove "hardship" as required by New Hampshire law.

Second Generation amended its complaint to challenge the ZBA decision as well as the ordinance. It alleged that Pelham had instituted an "absolute prohibition" against the construction of cell towers in residential zones, that at least four of the six licensed wireless carriers had significant coverage gaps along Route 128, and that it would be impossible to eliminate these gaps without building a cell tower in a residential zone. The ordinance and waiver, it asserted, violated 47 U.S.C. § 332(c)(7)(B)(i) by effectively prohibiting wireless service and unreasonably discriminating against the four carriers. It also added new claims that the ZBA's waiver denial was not supported by adequate written

_____

[4] The ZBA member observed that in a housing market appreciating at a rate of 1.5 percent per month, the fact that home values have remained stable over a few years is consistent with the proposition that cell towers reduce property values.

-6-

findings or substantial evidence in the record, in violation of § 332(c)(7)(B)(iii). Second Generation dropped its 42 U.S.C. § 1983 claim and its request for damages; it now requested only that the court enjoin the town ordinance.

Shortly after the ZBA decision, the New Hampshire Supreme Court decided Simplex Technologies, Inc. v. Town of Newington, 766 A.2d 713 (N.H. 2001), which relaxed the criteria for proving hardship in zoning board proceedings. Id. at 717. In May 2001, both parties filed summary judgment motions. On June 27, 2001, the district court remanded the case to the ZBA for a redetermination of hardship.

At the ZBA hearing on September 24, 2001, Second Generation presented testimony from two experts and two attorneys; several residents again testified in opposition. The hearing yielded the following new information. The Pelham Planning Director testified that the Planning Board was considering proposed subdivisions with approximately forty-five homes near the Second Generation tract. Second Generation's radio frequency engineer, Anthony Wells, presented a propagation study purporting to show that the alleged gap could not be serviced by existing Pelham towers, new 195-foot towers in the Overlay Zone, or an existing tower in Hudson, New Hampshire. Second Generation also made a number of concessions. First, Second Generation experts acknowledged that the company's tract was not the only site that

could provide coverage in the alleged gap. Second, they did not contest that a tower shorter than 250 feet could allow a limited number of carriers to service the alleged gap. Second Generation executives later said that they were willing to settle, at least temporarily, for a variance to build a 199-foot tower. Finally, when counsel to an abutter stated that carriers in New Hampshire can enter into right-of-way leases along state highways, Second Generation acknowledged that it had not explored this option and was unsure about its effectiveness.

The ZBA denied the waiver in a written decision dated September 27, 2001, finding that Second Generation did not meet any of the five conditions for obtaining a waiver, and, more specifically, that Second Generation had failed to meet any of the three unnecessary hardship criteria.

The parties again filed cross-motions for summary judgment in district court and agreed to resolve the case essentially on a case-stated basis. The court had before it the record developed as a result of the ZBA hearings; for the effective prohibition claim, it also considered other evidence submitted by the parties in support of their motions. Second Generation submitted affidavits that four of the six carriers licensed to provide wireless services in Pelham experienced gaps in coverage along Route 128, but that one licensed carrier, U.S. Cellular, had

roaming coverage in the alleged gap via the network of Cingular Wireless.

On May 21, 2002, the district court granted Pelham's motion for summary judgment and denied Second Generation's motion. Second Generation Props., L.P. v. Town of Pelham, No. Civ. 00-90-B, 2002 WL 1018923, at *6 (D.N.H. May 21, 2002). The court held that Second Generation did not meet its burden to show that there was a significant gap in coverage or its burden to show that the gap could not be filled by other means. It found that a gap is significant only if the area in question is not served by any carrier. Id. at *3. The court found that U.S. Cellular provided roaming service and Nextel might provide regular service along the relevant portion of Route 128. Id. It noted that Second Generation's propagation study did not consider the possibility that a carrier could obtain a waiver of the Ordinance's 199-foot height limitation and build a taller tower in the Overlay Zone. Id. In addition, the court observed that Second Generation failed to investigate whether other sites outside the Overlay Zone could provide the necessary service. Id. The district court also held that substantial evidence supported the ZBA's decision to deny the waiver. Id. at *4-*5.

II.

The TCA preserves state and local authority over the siting and construction of wireless communication facilities,

subject to five exceptions specified in the Act. 47 U.S.C. § 332(c)(7)(B); see Town of Amherst v. Omnipoint Communications Enters., Inc., 173 F.3d 9, 12 (1st Cir. 1999). Two exceptions, the substantial evidence and effective prohibition clauses, are pertinent here.[5] If a board decision is not supported by substantial evidence, § 332(c)(7)(B)(iii), or if it effectively prohibits the provision of wireless service, § 332(c)(7)(B)(i)(II), then under the Supremacy Clause of the Constitution, local law is pre-empted in order to effectuate the TCA's national policy goals.

A. Substantial Evidence Attack on ZBA Decision

Second Generation argues that the ZBA's decision is not supported by substantial evidence and so is invalid. The substantial evidence test is highly deferential to the local board. See Penobscot Air Servs., Ltd. v. Fed. Aviation Admin., 164 F.3d 713, 718 (1st Cir. 1999). As Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51 (1st Cir. 2001), explains:

> The 'substantial evidence' standard of review is the same as that traditionally applicable to a review of an administrative agency's findings of fact. Judicial review under this standard, even at the summary judgment stage, is narrow. . . . Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . [T]he possibility of drawing two inconsistent conclusions from

---

[5] A third exception is that a local board decision will not be upheld if it unreasonably discriminates "among providers of functionally equivalent services." § 332(c)(7)(B)(i)(I). Although such a claim was made in the complaint, it has been abandoned. Second Generation, 2002 WL 1018923, at *2 n.4.

the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.

Id. at 58 (internal quotations omitted). In conducting substantial evidence review, a reviewing court normally considers only evidence contained in the administrative record (i.e., the evidence presented to the ZBA). See Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals, 297 F.3d 14, 20-21 (1st Cir. 2002).

In order to qualify for a variance under New Hampshire law, the landowner must show that meeting the normal zoning requirements poses an unnecessary hardship. Olszak v. Town of New Hampton, 661 A.2d 768, 771 (N.H. 1995).[6] Under New Hampshire law, applicants must meet a three-prong test to establish unnecessary hardship:

> (1) a zoning restriction as applied to their property interferes with their reasonable use of the property, considering the unique setting of the property in its environment; (2) no fair and substantial relationship exists between the general purposes of the zoning ordinance and the specific restriction on the property; and (3) the variance would not injure the public or private rights of others.

Simplex Techs., Inc., 766 A.2d at 731-32. The ZBA found that Second Generation did not meet any of the prongs. It explained

_____

[6] Olszak provides that in order to obtain a variance, Second Generation had the burden to show: (1) a denial of the variance would result in unnecessary hardship to the applicant; (2) surrounding properties would suffer no diminution in value; (3) the proposed use would not be contrary to the spirit of the ordinance; (4) granting the variance would benefit the public interest; and (5) granting the variance would do substantial justice. 661 A.2d at 771.

-11-

that the land, given its unique setting, could reasonably be used for the residential purposes for which it was zoned and that there was a fair and substantial relationship between the ordinance and the restriction on the property because the ordinance "prohibits obtrusive commercial uses from infiltrating the residential zone."

Both of these determinations are amply supported by substantial evidence. There was considerable, unrebutted evidence that Second Generation's land is well suited for developing housing and that if Second Generation were granted a variance, then inhabitants of the aptly-named Scenic View Drive would look out over the top of a cell tower. The district court correctly characterized the administrative record as showing:

> The area [abutting the proposed tower] has no towers or other non-conforming commercial uses. Roads in the area are not lit by street lamps. Moreover, the property is located in a section of town that is prized for its spectacular views of the surrounding countryside. Several of the residences that would be affected by the proposed tower have deed restrictions protecting their views. Further, while only a limited number of existing residences would have a view of the tower, it is unclear whether it would also impair the views of any of the homes that are likely to be built in several proposed subdivisions in the area.

Second Generation, 2002 WL 1018923, at *5. In such a pristine (residential) setting, a 250-foot tower would be an obtrusive (commercial) use.

Second Generation protests that this court may only look to the Board's statements, and not to the district court's characterization. Second Generation confuses two different

-12-

doctrines.  This is not an instance in which the Board is improperly attempting to justify its decision in court on different grounds than it gave in its written decision.  Nat'l Tower, 297 F.3d at 21.  Instead, this is simply an instance in which the district court reviewed the record developed by the Board and provided more detail than did the Board in its decision.  That is entirely in accordance with the Act.  Local zoning boards are lay citizen boards, and while their decisions must be in writing, the boards need not make extensive factual findings in support of their ultimate decision.  S.W. Bell Mobile Sys., Inc., 244 F.3d at 59-60. The findings here are sufficient to permit judicial review, and that ends the challenge.

B.  Effective Prohibition Challenge

The more difficult question is whether, on the evidence before the district court, the denial of the variance sought by the landowner constituted an unlawful effective prohibition on the provision of wireless services.  See § 332(c)(7)(B)(i)(II).  This in turn raises a series of issues inherent in the "effective prohibition" analysis, including the requirements to show an effective prohibition; the contours of the "significant gap" formulation previously used by this court; and the relevance of evidence of coverage provided by roaming service, towers in other towns, and carriers not licensed in the town.  Most significantly, it raises the question of the correctness of the rule adopted by

-13-

the district court that if any carrier provides any coverage within a purported gap, then there cannot, as a matter of law, be an effective prohibition on the provision of wireless services. We disagree with and reject any such rule, but ultimately agree with the court's alternate ground for holding that there was no effective prohibition.

1. Scope of Review

Unlike the substantial evidence issue, the issue of whether the ZBA has prohibited or effectively prohibited the provision of wireless services is determined de novo by the district court. Nat'l Tower, 297 F.3d at 22. The district courts are free to consider additional evidence. Amherst, 173 F.3d at 16 n.7. In turn, this court reviews the district court's legal conclusions de novo. Nat'l Tower, 297 F.3d at 22. If the facts had been contested before the district court, we would review the district court's factual conclusions for clear error. Id. If the parties had each simply moved for summary judgment, we would review the district court's summary judgment conclusions de novo. See ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). Here, the parties agreed that the trial judge could resolve the issues on a case-stated basis. Second Generation, 2002 WL 1018923, at *1. Accordingly we review the inferences drawn by the district court from the stated facts for clear error. See Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 643-45 (1st Cir. 2000).

In the end, we would reach the same result here regardless of which of these standards of review applied.

2.  <u>General Standards for Anti-Prohibition Clause</u>

The rule in this circuit is that the TCA's anti-prohibition clause is not restricted to blanket bans on cell towers imposed by towns. <u>Amherst</u>, 173 F.3d at 14. The clause may, at times, apply to individual zoning decisions. <u>Id.</u> In invoking the effective prohibition language, "the burden for the carrier . . . is a heavy one: to show from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." <u>Id.</u> A landowner tower developer is in no better position than a carrier and has an equally heavy burden.[7]

The TCA does not itself expressly authorize local zoning boards to consider whether individual decisions amount to an "effective prohibition." <u>See</u> 47 U.S.C. § 332(c)(7). Since board actions will be invalidated by a federal court if they violate the effective prohibition provision, many boards wisely do consider the point. <u>See, e.g.</u>, <u>Amherst</u>, 173 F.3d at 16. There appears to be nothing in New Hampshire law to preclude a board from considering

_____

[7] The landowner who wishes to build a tower on its site is a unique plaintiff. A landowner does not have an incentive to identify possible sites on land it does not own. A landowner differs from a service provider, whose incentive is to choose from among all possible sites the option providing the cheapest, highest quality service.

the issue. The ZBA here implicitly did so by concluding that Second Generation had failed to show that there were no alternative sites to build a tower that would solve whatever coverage problem existed.[8] No special deference is given to the board's conclusion on this point.

This court has identified two sets of circumstances where there is a prohibition "in effect." The first is where the town sets or administers criteria which are impossible for any applicant to meet. See id. at 14. That was the situation in National Tower, which affirmed the district court's finding that a permit denial constituted an effective prohibition. See 297 F.3d at 23-25. The second involves the situation where the plaintiff's existing application is the only feasible plan; in that case, denial of the plaintiff's application "might amount to prohibiting personal wireless service." Amherst, 173 F.3d at 14; accord Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 640, 643 (2d Cir. 1999).[9]

_____

[8] It is not the town's burden, in response to an effective prohibition claim and where plaintiffs have produced no contrary evidence, to show in the first instance that alternative sites do exist. Nat'l Tower, 297 F.3d at 24. Nor is it the town's burden, in responding to a claim that its decision is not supported by substantial evidence, to show that alternative sites were available. Southwestern Bell, 244 F.3d at 63.

[9] The Third Circuit has suggested that the denial of a permit for a site that is the least intrusive means to close a significant gap in service would amount to a violation of the anti-prohibition clause. APT Pittsburgh Ltd. P'ship v. Penn Township Butler County, 196 F.3d 469, 479-80 (3rd Cir. 1999); see Cellular Tel. Co. v. Zoning Bd. of Adjustment, 197 F.3d 64, 70 (3rd Cir. 1999). The question of rejection of the least intrusive means must itself be

-16-

These factors, when pertinent, should be analyzed in determining whether there is an effective prohibition. This means, of course, that there can be no general rule classifying what is an effective prohibition. It is a case-by-case determination.

Second Generation initially attempts to show a violation of the anti-prohibition clause by arguing that the Personal Wireless Services Ordinance restricting the location of the towers to certain districts is a blanket prohibition. That attack is meritless. The Ordinance does not restrict the power to grant variances to build towers in other districts, the town has allowed four commercial towers to be constructed, and the town has not said as a categorical matter that it would never grant a variance outside the Overlay Zone. There is no credible claim of a blanket prohibition.

Second Generation then argues that the individual variance denial is an effective prohibition. The question of whether an individual denial is an effective prohibition is largely fact-driven. Since the effective prohibition clause is not self-

---

evaluated in the context of the other options available. See 360 Degrees Communications Co. v. Bd. of Supervisors, 211 F.3d 79, 87 (4th Cir. 2000) ("A community could rationally reject the least intrusive proposal in favor of a more intrusive proposal that provides better service or that better promotes commercial goals of the community."). This court has not addressed that precise point, nor need we do so here. See generally Indus. Communications and Elecs., Inc. v. Town of Falmouth, 2000 WL 761002 (D. Me. May 9, 2000) (order) (distinguishing between the Third Circuit's least intrusive means approach and the First Circuit's Amherst analysis).

-17-

explanatory, the importance of particular facts must be seen through the prism of the statutory language and intent. Overall, the TCA attempts to reconcile the goal of preserving local authority over land use with the need "to facilitate nationally the growth of wireless telephone service." Amherst, 173 F.3d at 13. Congress intended to promote a national cellular network. Id.; see also Todd, 244 F.3d at 57 (TCA reflects Congress's intent to rapidly expand personal wireless services); President's Statement on Signing the Telecommunications Act of 1996 (February 8, 1996), reprinted in 3 Federal Telecommunications Law: A Legislative History of the Telecommunications Act of 1996, doc. 95, at 208 (B.D. Reams, Jr. & W.H. Manz eds., 1997) (TCA intended to promote universal service). The Act aims to secure lower prices and better service for consumers by opening all telecommunications markets to competition. See Telecommunications Act of 1996, Pub. L. No. 104-104, pmbl., 110 Stat. 56, 56; H.R. Conf. Rep. No. 104-458, at 113 (1996), reprinted in 1996 U.S.C.C.A.N. 10, 10.[10] Thus, the Act attempts to reconcile the interests of consumers and residents (many of whom are themselves cell phone users).

---

[10] The committee reports and presidential and vice-presidential statements on the TCA and its precursors do not discuss the meaning of the effective prohibition section. See 1, 3 Federal Telecommunications Law, supra.

a. "Significant Gap" Formulation

Courts have provided a judicial gloss on the effective prohibition language of the statute in order to determine whether a coverage problem exists at all.  We have concluded that a town's refusal to permit a tower that is needed to fill a "significant [geographic] gap" in service, where no service at all is offered in the gap, would violate the effective prohibition clause.  See Nat'l Tower, 297 F.3d at 20; accord Willoth, 176 F.3d at 643; APT Pittsburgh Ltd. P'ship, 196 F.3d at 480.  The context in which a question arises is important.  In National Tower, where this circuit adopted and employed a significant gap analysis, it was undisputed that no carrier provided coverage in the geographic gap area and that the gap affected the ability of a large number of users to connect or maintain a connection, id. at 17-18.  The issue addressed in National Tower by the "significant gap" formulation, then, had to do with when a purported geographic gap, served by no carrier, is large enough in terms of physical size and number of users affected to amount to an effective prohibition, rather than being a mere, and statutorily permissible, dead spot.  Federal regulations contemplate that areas enjoying adequate coverage will still include spots without reliable service.  See 360 Degrees Communications Co., 211 F.3d at 87; 47 C.F.R. § 22.911(b) (2001); see also id. § 22.99 (defining dead spots as "[s]mall areas within

a service area where the field strength is lower than the minimum level for reliable service").

Like many legal concepts, the "significant gap" language used in one context is now being used by the parties to address a qualitatively different and much more complex set of problems.  The parties use the phrase to frame arguments about whether an effective prohibition can exist in a geographic area where a carrier already provides some service.  The ultimate question of course remains whether a given decision, ordinance, or policy amounts to an effective prohibition on the delivery of wireless services.  Inquiries into the existence and type of gap are merely helpful analytic tools toward that end.[11]

b.  Consideration of Services by Out-of-town Carriers

Second Generation attempts to buttress its argument by saying the coverage that does exist should be ignored and so this is actually a situation where no carrier provides coverage.  The only carriers that provide coverage in the purported gap are U.S. Cellular, which provides roaming service via the Cingular Wireless network, and Cingular Wireless, which is not licensed in Pelham and provides service from a tower in Dracut, Massachusetts.

---

[11] Perhaps in recognition of the complexity of applying such an analysis in varying situations, the Fourth Circuit found unhelpful "additional formulation[s]" such as the "significant gap" phrase.  360 Degrees Communications Co., 211 F.3d at 87.

Second Generation raises a question of law as to whether the town or court may consider service by these carriers. In ascertaining the existence and extent of coverage for purposes of resolving an effective prohibition claim (and indeed the proposed solution), we hold it permissible to consider (1) roaming service, (2) the coverage provided from towers in other towns, and (3) service by carriers not licensed in the jurisdiction at issue. See Cellular Tel. Co., 197 F.3d at 71 ("Under the right conditions it may be possible to provide an adequate level of personal wireless services to a particular community solely through facilities located outside that community."); accord Omnipoint Communications MB Operations, LLC v. Town of Lincoln, 107 F. Supp. 2d 108, 117 n.8 (D. Mass. 2000).

Second Generation protests that this result would allow Pelham to displace onto other jurisdictions the obligation to host new cell towers and would infringe the rights of carriers that purchased FCC licenses for the geographic area including Pelham. Both these arguments overlook the fact that licensed carriers may be able to co-locate on the same (existing) tower(s) used by out-of-town carriers.[12] The argument, moreover, runs contrary to the

_____

[12] In this case, no information has been provided as to whether towers in nearby towns can host additional carriers. See generally R. Long, Allocating the Aesthetic Costs of Cellular Tower Expansion: A Workable Regulatory Regime, 19 Stan. Envtl. L.J. 373, 386-87 (2000) (observing that "co-location" on the same tower of antennas belonging to multiple

TCA's emphasis on protecting the interests of consumers and residents rather than those of carriers and developers.

3.        Rejection of Rule That Any Coverage Equals No Effective Prohibition

This case squarely raises the issue, which has divided the courts, of whether there can ever be an effective prohibition of personal wireless service if there is any carrier that provides coverage in the geographic gap area. The district court, following the Third Circuit holding in ATP Pittsburgh Ltd. Partnership, 196 F.3d at 480, adopted the rule that if any coverage is provided in the gap area by any carrier (including roaming service through a tower in a different town) then there can be no effective prohibition.[13]

carriers has become an increasingly common practice). We would view very differently a case in which a town attempted to deflect onto another jurisdiction the need to build new towers necessary to provide services to meet the TCA's goals where no service has been provided.

[13] The district court also thought the Second Circuit had adopted such a rule in Sprint Spectrum L.P. v. Willoth, 176 F.3d 630 (2d Cir. 1999). We read the case differently. The relevant passage appears to hold that once a carrier has adequate (though less than perfect) service in an area, local boards can deny applications by that carrier for additional towers without violating the effective prohibition clause. Id. at 643. This reading is buttressed by the context in which this passage appears: the following two paragraphs explain that there is no effective prohibition because Sprint could provide adequate coverage with just one or two towers rather than the three towers it requested in its application. Id. at 643-44. The court's effective prohibition analysis does not discuss the provision of wireless services by other carriers. Id. at

A flat "any service equals no effective prohibition" rule would say a town could refuse permits to build the towers necessary to solve any number of different coverage problems.[14]

---

639-44. Furthermore, its stress on adequate coverage should logically mean that circuit would oppose an "any coverage equals no gap" rule. See id. at 643 ("Furthermore, once an area is sufficiently serviced by a wireless service provider, the right to deny applications becomes broader: State and local governments may deny subsequent applications without thereby violating subsection B(i)(II).") (emphasis added).

[14] Problems could arise in the following situations.
1) The only carrier providing service in a gap area does not provide service nationwide. The established carriers want to fill a significant geographic gap in their nationwide networks by constructing a tower in the town. The town denies the established carriers' application to build a tower in the only feasible location on the ground that a carrier already provides service in the town.
2) A gap is served by carrier A, which provides coverage for 1% of the cell phone users in the area. Some 99% of local users, who subscribe to different carriers, have no service in the gap. There is no more room on the tower used by carrier A to add the other carriers and the town denies a permit to build a tower in the only other feasible location.
3) Carrier A, using a minority technology, provides service in a gap. A town then refuses to permit the construction of a tower to serve the carriers who use the alternative and prevalent technology. Or vice-versa. There are no feasible alternatives.
4) Carriers first provide service in the geographic gap to a small percentage of potential users and then the number of subscribers grows exponentially such that there is a deterioration of services. The majority of calls fail in a new geographic gap but occasionally some go through. The carriers want to build a new tower in the only feasible location so the customers can receive uninterrupted service. The town denies a permit.
5) A new generation of technology emerges but it cannot compete with older technologies because carriers using the new technology cannot build towers in the only feasible locations. The town denies permits on the ground that old technology

It is highly unlikely that Congress intended the many qualitatively different and complex problems to be lumped together and solved by a rule for all seasons that any coverage in a gap area automatically defeats an effective prohibition claim. Such a rule would be highly problematic because it does not further the interests of the individual consumer. To use an example from this case, it is of little comfort to the customer who uses AT&T Wireless (or Voicestream, Verizon, Sprint, or Nextel) who cannot get service along the significant geographic gap which may exist along Route 128 that a Cingular Wireless customer does get some service in that gap. Of course, that AT&T customer could switch to Cingular Wireless. But were the rule adopted, the same customer might well find that she has a significant gap in coverage a few towns over, where AT&T Wireless, her former provider, offers service but Cingular Wireless does not. The result would be a crazy patchwork quilt of intermittent coverage. That quilt might have the effect of driving the industry toward a single carrier. When Congress enacted legislation to promote the construction of a nationwide cellular network, such a consequence was not, we think, the

carriers already provide service in the area.

-24-

intended result, see, e.g., S. Rep. No. 104-23, Purpose of the Bill (1995), reprinted in 1 Federal Telecommunications Law, supra, doc. 2, at 1 (bill aims to "open[] all telecommunications markets to competition"); H.R. Rep. No. 104-204, Purpose and Summary (1995), reprinted in 1 Federal Telecommunications Law, supra, doc. 3, at 47-50.[15] The fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers.

Our reading of the statute also rests on its language:

> (i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof --
> . . . .
> (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

---

[15] That the district court's rule may have some anti-competitive effects seems reasonable. But no evidence on the severity of these effects or other economic implications has been provided by the parties. In the absence of such evidence, we proceed cautiously. See Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C., 518 U.S. 727, 742 (1996) ("[A]ware as we are of the changes taking place in the law, the technology, and the industrial structure related to telecommunications, we believe it unwise and unnecessary definitively to pick one analogy or one specific set of words now.") (citation omitted); id. at 777 (Souter, J., concurring) (because the technology is continuing to evolve, and because technological changes have substantial regulatory implications, "we should be shy about saying the final word today about what will be accepted as reasonable tomorrow").

§ 332(c)(7)(B). We start with the fact that Congress used "services" and not "service." A straightforward reading is that "services" refers to more than one carrier. Congress contemplated that there be multiple carriers competing to provide services to consumers. That one carrier provides some service in a geographic gap should not lead to abandonment of examination of the effect on wireless services for other carriers and their customers. Next, the phrase "have the effect of prohibiting" may well refer to actions that mostly prohibit. For example, B.A. Garner, A Dictionary of Modern Legal Usage 256 (2d ed., 1995), gives as the first definition of effective "having a high degree of effect." (emphasis added). Accord B.A. Garner, A Dictionary of Modern American Usage 237-38 (1998). Moreover, a common reading of the word "prohibition" standing alone would apply to a situation of denial of services to the vast majority of users. See, e.g., Oxford English Dictionary (2d ed. 1989) (defining "prohibit" as "to prevent, preclude, hinder") (emphasis added). Thus Congress may well have meant the effective prohibition clause to reach certain situations in which there is some coverage in a gap.

One might hypothesize that the "unreasonable discrimination" language of the Act would adequately address situations where customers of some but not all carriers lack

-26-

service in an area. The argument would proceed that the anti-prohibition clause should be strictly read as applying only to de jure and de facto absolute prohibitions. This court has not yet explicated the unreasonable discrimination clause and we do not do so here. Nevertheless, the law from other circuits gives little reason to think this clause will effectively safeguard congressional efforts to promote the building of a nationwide cellular network. Some courts have held that towns can discriminate against proposals that have different aesthetic or safety ramifications, Willoth, 176 F.3d at 638-39; see also H.R. Rep. No. 104-458 (1996), reprinted at 1 Federal Telecommunications Law, supra, doc. 5, at 208; S. Rep. No. 104-230 (1996), reprinted in 1 Federal Telecommunications Law, supra, doc. 6, at 208, or a different structure, placement, or cumulative impact, see Nextel W. Corp. v. Unity Township, 282 F.3d 257, 267 (3rd Cir. 2002). See generally AT&T Wireless PCS, Inc. v. City Council of Va. Beach, 155 F.3d 423, 427 (4th Cir. 1998) (some discrimination between providers of functionally equivalent services is allowed).

Towns, of course, are far from powerless, despite our rejection of the rule. An applicant for a zoning permit arguing that there is an effective prohibition must still show that there are no alternative sites which would solve the problem. Importantly, if an existing carrier provides service, then by

-27-

definition there is a tower used by that owner, and the tower may offer the possibility of co-location. If co-location on such a tower is not possible, there may be other solutions that the town regards as more palatable than the applicant's proposed tower. Finally, even if there were a significant coverage problem in terms of a number of different carriers being unable to provide service to a significant number of users, we think a town would be entitled to consider whether a particular proposed tower would solve the problem for a smaller or larger number of providers. Here, the firm evidence was that a tower on Second Generation's property would assist two of the carriers. Little evidence was submitted about whether it would solve the purported problem for the other four licensed carriers.

4.      Effective Prohibition and Other Potential Solutions

Dispositively on the effective prohibition issue, the record shows that Second Generation has not met its burden to show that there are no other potential solutions to the purported problem. Specifically, Second Generation failed to show that a taller tower (for which a height variance would be needed) could not be built in the Overlay Zone to remedy the alleged gap. Nor did it show that no other feasible sites existed outside of the Overlay Zone or that the ZBA would deny variances for such sites. Second Generation's own experts acknowledged that its land was not the only location where a tower could provide coverage in the

purported gap and that its proposed tower was likely taller than necessary to service the alleged gap. Second Generation also failed to explore whether existing towers in nearby jurisdictions (which enabled U.S. Cellular customers to obtain roaming service) could provide other carriers with coverage in the purported gap.

Though Second Generation has not on this record demonstrated that this individual denial of a permit constituted an effective prohibition, it appears there may be a coverage problem requiring a solution. Nothing in the Town's actions thus far shows an unwillingness to acknowledge a problem or to permit the crafting of a solution. The record suggests a range of possible solutions, none yet determined to be infeasible, ranging from more co-location on existing towers in nearby towns, to the construction of less aesthetically disruptive towers in Pelham, to the placement of towers along median strips. Those are the sorts of choices and trade-offs which the Act permits towns to make in the first instance. See Amherst, 173 F.3d at 15; Aegerter v. City of Delafield, 174 F.3d 886, 891 (7th Cir. 1999). In this situation the heavy artillery of federal preemption is simply unwarranted.

The judgment of the district court is **affirmed**. Costs are awarded to Pelham.