FILED
United States Court of Appeals
Tenth Circuit

**March 8, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

AT&T MOBILITY SERVICES, LLC,

     Plaintiff - Appellee,

v.

VILLAGE OF CORRALES,

     Defendant - Appellant.

No. 15-2069
(D.C. No. 1:13-CV-00785-MV-SCY)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **KELLY**, **PORFILIO**, and **BALDOCK**, Circuit Judges.
_____

The Telecommunications Act of 1996 (TCA) preserves the authority of state and local governments "over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). There are, however, a number of limitations on the exercise of that authority, including that any decisions cannot "prohibit or have the effect of prohibiting the provision of personal wireless services." *Id.* § 332(c)(7)(B)(i)(II). When the Village

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of Corrales denied AT&T Mobility Services, LLC a special permit to construct a 65-foot tall wireless telecommunications facility (a cell phone tower), AT&T filed suit, asserting (among other things) that the Village's denial amounted to an effective prohibition of personal wireless services in violation of the TCA. The district court agreed, granted summary judgment in favor of AT&T, and ordered the Village to approve the necessary permits. The Village appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

The Village of Corrales is a town of about 8,000 residents located just north of Albuquerque, New Mexico. Most of the Village is zoned for agricultural and rural residential uses, but it has smaller areas zoned for commercial or municipal use. Personal wireless service facilities are not permitted anywhere in the Village, but they may be allowed by a special use permit in a commercial or municipal zone. With limited exceptions not applicable here, the Village also has a height restriction of 26 feet for structures in all zones. It does, however, permit variances when necessary provided that a structure taller than 26 feet is not detrimental to the rural and agricultural values the Village seeks to preserve. Indeed, when AT&T applied for the special use permit at issue in this case, the Village already had two other 65-foot cell phone towers, one of which was permitted for AT&T.

AT&T applied for a special use permit, a height variance, and a site development plan to install a 65-foot monopole cell phone tower and a small equipment shelter in a 30' x 30' compound on a commercial parcel in the Village.

2

The Village's Planning and Zoning Commission denied the special use permit and, accordingly, did not act on the variance request or the proposed site development plan. AT&T appealed to the Village Council, which also denied the special use permit. The Council concluded that AT&T failed to show that the proposed facility would fill a significant gap in coverage or that the desired improvements could not be achieved by placing the facility on higher terrain or using a shorter tower on the selected site. The Council also determined that the proposed facility would be visually intrusive, negatively affect the value of nearby residential properties, and impair the Village's rural residential, agricultural, and open-space qualities.

AT&T then filed the action at hand. It claimed that the Village's denial of the special use permit effectively prohibited the provision of personal wireless services and that substantial evidence did not support the Village Council's decision, both in violation of the TCA. *See* 47 U.S.C. § 332(c)(7)(B)(i)(II), (c)(7)(B)(iii). AT&T also sought administrative review under New Mexico law. The parties filed cross-motions for summary judgment. In support of its motion, AT&T submitted a report by Geoffrey Burley, an AT&T radio-frequency (RF) engineer, which provided a detailed analysis of the coverage gap AT&T sought to fill by constructing the new tower. The Village challenged the admission of Burley's report on the ground that AT&T had not submitted it to the Village Council. The district court agreed that Burley's report was not admissible for purposes of the substantial-evidence and administrative-review claims, but it ruled that it could consider the report in support of AT&T's effective-prohibition claim, noting that courts have uniformly held the

question to be a legal one for the district court's consideration in the first instance, without any deference to a local zoning board.[1]

Because admissibility was the Village's sole objection to Burley's report, the district court treated certain facts in the report as uncontroverted and proceeded to grant summary judgment in favor of AT&T on its effective-prohibition claim. The court explained that although the Village had not completely prohibited the provision of wireless services in Corrales, AT&T could prevail on its effective-prohibition claim by showing that (1) the denial of a permit prevented AT&T from closing a "significant gap" in existing services and (2) its proposed facility was the least intrusive means of doing so. *See Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 48 (1st Cir. 2009) (setting forth test); *Nextel W. Corp. v. Town of Edgewood*, 479 F. Supp. 2d 1219, 1237–38 (D.N.M. 2006) (same). And the court concluded that AT&T had met both prongs of the test.[2]

_____

[1] *See, e.g.*, *VoiceStream Minneapolis, Inc. v. St. Croix Cty.*, 342 F.3d 818, 833 (7th Cir. 2003); *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002); *APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler Cty.*, 196 F.3d 469, 475 (3d Cir. 1999). The Village does not challenge the district court's ruling on the admissibility of Burley's report.

[2] Circuit courts are split over whether the significance of a gap should be viewed from the carrier's perspective or the consumer's perspective. In a carrier-perspective jurisdiction, a carrier can meet the first prong of the test by showing a significant gap in the carrier's existing service. In a consumer-perspective jurisdiction, a carrier must show that no wireless carrier provides service to the area. *See City of Cranston*, 586 F.3d at 49 (discussing split); *T-Mobile Central, LLC v. Unified Gov't of Wyandotte Cty./Kan. City*, 528 F. Supp. 2d 1128, 1153–55, 1165 (D. Kan. 2007) (same), *aff'd on other grounds*, 546 F.3d 1299, 1303 (10th Cir. 2008). As our ensuing discussion shows, the district court appears to have applied the

(continued)

4

As to whether there was a significant gap, the district court recognized there are no bright-line rules but that each case is to be considered on its own, taking into account a number of factors courts have identified, including the gap's physical size and location, the number of affected customers, dropped-call or failure rates, and "whether the purported gap affects a plaintiff's ability to provide outdoor, in-vehicle, and in-building coverage." *See Orange Cty.-Poughkeepsie Ltd. P'ship v. Town of E. Fishkill*, 84 F. Supp. 3d 274, 297 (S.D.N.Y. 2015) (collecting cases). In light of those factors and the TCA's emphasis on "promot[ing] competition and higher quality in telecommunications services" and "encourag[ing] the rapid deployment of new telecommunications technologies," *T-Mobile Central, LLC v. Unified Gov't of Wyandotte Cty.*, 546 F.3d 1299, 1306 (10th Cir. 2008), the court rejected the Village's argument that improving signal strength in the target area from in-vehicle to in-building (one of AT&T's stated goals) was insufficient to constitute a significant gap. Instead, the court reasoned that such "gradations in service" were an appropriate consideration. Aplt. App., Vol. III at 445.

In applying the foregoing factors, and relying largely on undisputed facts from Burley's report, the court concluded that the coverage gap around the selected site was significant because (1) "the gap covers a populated and well-traveled area approximately two miles across"; (2) "the absence of a dominant server in the area means that signals from several other towers interfere with one another and cause

carrier-perspective standard, and neither party has challenged that approach. Accordingly, we express no opinion on the issue.

5

issues with establishing or making telephone calls"; and (3) "much of the affected area includes a residential zone without reliable in-home coverage." *Id.* at 446. The court also found further support for its decision in the TCA's "flexible nature . . . and the growing importance of mobile technologies in American life." *Id.*

The district court next explained that AT&T had established its proposal was the least intrusive manner to fill the gap because AT&T showed it had made "a good faith effort . . . to identify and evaluate less intrusive alternatives," such as "less sensitive sites, alternative system designs, alternative tower designs, [and] placement of antennae on existing structures." *APT Pittsburgh Ltd. P'ship v. Penn Twp. Butler Cty.*, 196 F.3d 469, 480 (3d Cir. 1999).

As Burley explained in his report, given the topography of the area and the rather dense tree canopy that a signal would have to penetrate, an 80-foot tower would be optimal, but a 65-foot monopole would reduce the visual impact and be sufficient to meet technical requirements and alleviate a significant portion of the gap. "At lower radiation centers, the problem gets worse; not only would it provide less coverage, but a lower site would remain under-utilized as surrounding sites reach capacity, requiring additional towers in the area to relieve the burden." Aplt. App., Vol. II at 228–29, ¶ 30. Further, the antenna array would be housed in a shroud, and the tower would not be lighted. AT&T also presented some evidence that the tower would not have an adverse effect on the property values of adjacent homes, and it considered three alternative sites but concluded that they would be more intrusive and less effective in remedying the coverage gap.

6

Because summary judgment on AT&T's effective-prohibition claim was dispositive, the court did not reach AT&T's other claims.

## DISCUSSION

We review de novo the disposition of cross-motions for summary judgment, applying the same standard as the district court, and viewing the evidence and construing all reasonable inferences from it in light of the losing party. *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Village raises two principal arguments on appeal. It first contends that the district court's consideration of the unreliability of coverage—what the court referred to as "gradations of service"—runs afoul of case law recognizing that holes in coverage or "dead spots" that are limited in number or size do not constitute a significant gap in service. *See, e.g.*, *MetroPCS, Inc. v. City and Cty. of San Francisco*, 400 F.3d 715, 733 n.10 (9th Cir. 2005), *abrogated on other grounds by T-Mobile So., LLC v. City of Roswell*, 135 S. Ct. 808 (2015); *Second Generation Properties, L.P. v. Town of Pelham*, 313 F.3d 620, 631 (1st Cir. 2002); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643–44 (2d Cir. 1999). The Village argues that there will always be "gradations in service," and opines that the district court's standard means any unreliability in coverage will be deemed a significant gap, which will inevitably lead to a virtual "forest of cell towers all across the land." Aplt. Br. at 17–18. The Village adds that the district court overlooked two other factors—the

7

number of AT&T customers potentially affected and the actual dropped or failed call rates—information which AT&T refused to provide.

We disagree. A number of courts have concluded that the lack of reliable in-building or in-vehicle service is a legitimate consideration in determining whether a coverage gap is significant. *See, e.g.*, *Town of E. Fishkill*, 84 F. Supp. 3d at 297 (in-building and in-vehicle coverage); *T-Mobile Central, LLC v. Unified Gov't of Wyandotte Cty./Kan. City*, 528 F. Supp. 2d 1128, 1168-69 (D. Kan. 2007) (in-building coverage), *aff'd on other grounds*, 546 F.3d 1299 (10th Cir. 2008); *Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y. 2003) (in-vehicle coverage). Another important, related consideration is whether a gap "straddles a significant commuter highway" or "a well-traveled road [that] could affect large numbers of travelers . . . and the people who are trying to communicate with them." *Cellular Tel. Co. v. Zoning Bd. Of Adjustment*, 197 F.3d 64, 70 n.2 (3d Cir. 1999). To be sure, isolated "dead spots" or de minimis areas of noncoverage do not amount to a significant gap; examples include "a small residential cul-de-sac," *id.*, "the interior of buildings in a sparsely populated rural area," or "a limited number of houses or spots as the area covered by buildings increases," *Willoth*, 176 F.3d at 643. But the undisputed evidence in this case establishes that the coverage gap is not so limited. Burley's report makes clear that in-vehicle coverage is unreliable for approximately two miles along the Village's main road and in-building coverage is unreliable around the proposed site in a ring that is more than a mile across. And as the Village admitted in its answer to the complaint, the selected site "is located in a

8

populated and well-traveled area." Aplt. App., Vol. I at 32. Hence, the district court did not err in considering the level of reliable in-building and in-vehicle coverage.

Nor did the district court err by failing to take account of the lack of data regarding the number of AT&T customers potentially affected or the number of dropped calls. While these are among the factors a court can consider, the Village directs us to no case law requiring consideration of every factor, and we have found none. Instead, we think it sufficient that the court considered the lack of reliable in-building coverage in a residential zone, unreliable in-vehicle coverage along the Village's main road, and the absence of a dominant server in the area, to be of prime importance. And Burley substantiated these factors with objective evidence, including RF propagation maps and a drive test.[3] But even if only a few of AT&T's customers were presently affected, AT&T would be unable to meaningfully compete with any other carrier that was providing adequate coverage in the gap area, which would weigh in favor of concluding the gap is significant. *See Town of Pelham*,

---

[3] RF propagation maps and drive tests are the "primary tools" used to evaluate signal strength:

> Propagation maps are relatively sophisticated computer models that predict signal strength throughout the area in question. Drive tests, by contrast, are empirical rather than predictive. They are conducted by using sensitive radio frequency scanning and global positioning system equipment which is attached to a vehicle that is driven throughout a given area in order to record actual signal strength data. The drive test data is then used to create a map illustrating actual signal strength at locations throughout the area driven. Both propagation maps and drive tests are widely used throughout the wireless industry and are generally recognized as reliable and accurate.

*Wyandotte Cty./Kan. City*, 528 F. Supp. 2d at 1166.

9

313 F.3d at 631 ("The [TCA] aims to secure lower prices and better service for consumers by opening all telecommunications markets to competition."); *cf. id.* at 633 (reasoning that if a complete absence of any wireless coverage in an area was required to show a significant gap, "[t]he result would be a crazy patchwork quilt of intermittent coverage . . . [that] might have the effect of driving the industry toward a single carrier," hindering competition).

The Village's other principal argument is that AT&T failed to show it considered tower heights of less than 65 feet as part of its good-faith inquiry into whether a 65-foot tower was the least intrusive means of remedying the coverage gap. The Village posits that because the RF coverage maps for the 80-foot and 65-foot options are essentially indistinguishable, there is no evidence to show that a shorter tower would be inadequate to remedy the gap.

We are not persuaded. The differences between the RF coverage maps for the 80- and 65-foot options appear rather minimal. *See* Aplt. App., Vol. II at 245-46. But pure coverage was not the only basis for Burley's opinion that a shorter tower would be inadequate. Burley also stated that a lower site would be underused, which would require additional towers in the area, and that a 65-foot tower would provide the area with a dominant server and eliminate interference with establishing and maintaining calls. He supported that opinion with computer models showing the current level of interference and that either an 80-foot or 65-foot tower eliminated the interference. *See id.* at 253-55. Although Burley might have made it clearer, we think the only reasonable inference to be drawn from the undisputed facts set forth in

10

his report is that a lower tower would be inadequate to sufficiently remedy the gap and to establish a dominant server. At the least, his report shows that AT&T made a good-faith effort to evaluate whether a tower of less than 65 feet would alleviate the coverage gap, *see Penn Twp. Butler Cty.*, 196 F.3d at 480, which is the standard the district court applied. Moreover, the Village has not indicated that a greater number of shorter towers would be an acceptable alternative.

## CONCLUSION

The judgment of the district court is affirmed.

Entered for the Court

Bobby R. Baldock
Circuit Judge

11