# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-2889

VOICESTREAM MINNEAPOLIS,
INCORPORATED, formerly known as
APT MINNEAPOLIS, INCORPORATED,
a Delaware corporation,

*Plaintiff-Appellant,*

*v.*

ST. CROIX COUNTY, a Wisconsin
political subdivision, and its
Board of Adjustment,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 01 C 504—**Barbara B. Crabb**, *Chief Judge.*

ARGUED FEBRUARY 18, 2003—DECIDED SEPTEMBER 8, 2003

Before RIPPLE, DIANE P. WOOD and EVANS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* VoiceStream Minneapolis, Inc. ("VoiceStream") brought this action against the County of St. Croix, Wisconsin, and its Board of Adjustment (collectively, "the County") under § 704 of the Telecommunications Act of 1996, 47 U.S.C. § 332. The County had denied VoiceStream's application for a special exception permit

to construct and operate a telecommunications tower. The district court granted summary judgment in favor of the County. It held that the County's denial of Voice-Stream's application was supported by substantial evidence and that VoiceStream had failed to demonstrate that the County's decision had the effect of prohibiting personal wireless services. VoiceStream asks us to reverse the judgment of the district court and to direct that an injunction be granted, directing the County to issue the requested permit. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

VoiceStream, formerly known as APT Minneapolis, Inc., is a provider of personal communication services ("PCS"). St. Croix County is a political subdivision of the State of Wisconsin. The St. Croix County Board of Adjustment ("Board of Adjustment") is a quasi-judicial arm of the County with the responsibility for reviewing applications for special exception permits ("SEP") under the County's zoning ordinance. VoiceStream is licensed by the Federal Communications Commission ("FCC") to provide PCS to customers in several states, including Wisconsin and Minnesota. The County is included within the geographic boundaries of VoiceStream's license for providing PCS in Wisconsin.

VoiceStream's commercial license requires it to provide adequate PCS coverage to its customers within the geographic boundaries of its license. *See* R.22 at 5-6. The technology that VoiceStream is licensed to implement requires

the construction and placement of antennas that are capable of receiving and transmitting wireless communication signals in accordance with radio frequency standards. *See id.* at 7. The location of these antennas "takes into account several factors including (a) population demands (residential, commercial, and vehicular), (b) topographical constraints of the land, such as uneven terrain, buildings, extensive tree cover or vegetation, (c) the height of the proposed antenna, and (d) the proximity to and height of other antennas." *Id.* In order for PCS to function properly, the antenna must be elevated to allow a relatively unimpeded line of sight to the end users' telecommunications equipment. *See id.* This goal often is attained by locating the antenna on an existing structure such as a water or fire tower. *See id.* Where no such structure is available, a communications tower must be constructed to elevate the antenna to the proper height. *See id.* Although the signal from the antenna can penetrate trees and buildings, it cannot penetrate hills. *See* R.29 at 22. Thus, in order to provide PCS in an area with hills, the service provider must either increase the elevation of the antenna or increase the number of antenna locations. *See* R.20, Ex.4 at 21.

VoiceStream began seeking a location for an antenna that would fill a gap in its PCS coverage along Wisconsin Highway 35, Minnesota Highway 95, the St. Croix River Valley and the surrounding area. *See* R.16, Ex.B at 1. VoiceStream determined that, in keeping with its goal of meeting "full coverage objective[s] with only one tower," R.16, Ex.EE, § 2 at 1, the best site was on the agriculturally zoned property owned by William and Opal Haase ("Haases") in Somerset Township, Wisconsin ("Somerset site"). Somerset is located in St. Croix County.

The Somerset site sits on a bluff overlooking the St. Croix River and the Lower St. Croix National Scenic Riverway (the

"Riverway"). In fact, the proposed tower would be located just 660 feet east of the Riverway boundary. *See* R.16, Ex.C at 2. The Riverway runs north to south as the river flows past the Somerset site. The river serves as the boundary between Wisconsin and Minnesota. *See* R.20, Ex.4J. The National Park Service ("Park Service") owns and manages the Riverway, which includes the St. Croix River and approximately 1/4 mile of land on either side in Minnesota and in Wisconsin. *See* R.29 at 5-6. The County has exercised its zoning authority over that portion of the Riverway that is within its boundaries and has created a zoning district bordering the river called the "Riverway District." *See* R.20, Ex.1 at 4. The Riverway "was designated under the Wild and Scenic Rivers Act in 1972 (Public Law 90-542) [16 U.S.C. § 1271 *et seq.*] to protect its outstandingly remarkable scenic, recreational and geologic values for present and future generations." R.16, Ex.D.

Directly across the river from the Somerset site is the City of Marine on St. Croix ("Marine") and the Marine on St. Croix Historic District ("Historic District"). *See id.* The Historic District includes the Marine Mill ruins, which is the site of the first sawmill in Minnesota and the birthplace of the Minnesota lumbering industry. *See id.* The Historic District was nominated to the National Register of Historic Places in 1974. *See id.*

In 1997, the County enacted Ordinance No. 440, which regulates the placement of wireless communication facilities in the County and provides a specific application process for new facilities. *See* R.16, Ex.F. One of the stated purposes of the ordinance is to "[m]inimize adverse visual effects of wireless communication facilities through careful siting and design standards." *See id.* at 1. Wireless communication facilities are regulated according to the zoning district in which the property is located. *See id.* at 3. When property is

located in an agricultural district, anyone seeking to attach an antenna to an existing structure where the antenna extends more than 20 feet above the structure, or seeking to construct a new tower with a maximum height of 300 feet, must submit a SEP application to the Board of Adjustment pursuant to § 17.70(7) of the County ordinance. *See id.* at 4. A SEP application also must be submitted in order to place an antenna in the Riverway District. *See id.* However, the zoning ordinance regulating the Riverway District only permits an antenna to be attached to an existing structure, and the antenna must not extend more than 20 feet above the structure. *See id.* No other towers or antennas are permitted in the Riverway District. *See id.*

On February 9, 2000, VoiceStream entered into a lease agreement with the Haases. The agreement gave Voice-Stream permission to build and maintain a communications facility on the Haases' agriculturally-zoned property, subject to the requirement that VoiceStream obtain all necessary permits from local and federal land use jurisdictions. *See* R.16, Ex.A. The most prominent feature of the proposed facility would be an 185-foot tower upon which the PCS antennas would be located. *See* R.16, Ex.H.[1]

On March 7, 2000, VoiceStream sent a letter to the Planning Commission for the Town of Somerset, requesting approval for its tower. *See* R.16, Ex.B. The town planning commission met on March 15, 2000, to consider the tower

---

[1]  At its base the proposed tower is over five feet in diameter. *See* R.16, Ex.H. The diameter of the tower tapers gradually as it extends upward and measures three feet in diameter at the midpoint, and two feet in diameter at the top. *See id.* Atop the tower sits a triangular array of antennas. *See* R.16, Ex.G. Each of the three sides of this array extend outward from the tower and span approximately fifteen to twenty feet. *See id.*

proposal. *See* R.16, Ex.C at 2. At this meeting, several members of the local community expressed concern that the proposed tower was not in keeping with the pristine scenic nature of the Riverway. *See id.* at 3. A Park Service representative also testified concerning the millions of dollars that had been spent to preserve the scenic qualities of the Riverway. He opined that allowing a 185-foot tower in this location would be a visual intrusion on the Riverway and would pose a serious threat to the scenic values that the Riverway was designed to protect. *See id.* The Planning Commission, in its advisory role to the Somerset Town Board, voted six-to-one to deny the proposed tower because of "the visual impact on the area and a lack of clarity in the presentation." *Id.* at 4. Despite this negative recommendation, the Somerset Town Board voted two-to-one to approve the Somerset site with the provision that the Haases and VoiceStream further consider what specific tower design would be least obtrusive at that location. *See* R.16, Ex.E. The Somerset Town Board also noted that County approval would be necessary for the proposed tower. *See id.*

In short order, VoiceStream filed a SEP application for the Somerset site with the County Zoning Office. *See* R.16, Ex.G. The Board of Adjustment promptly scheduled a hearing to review the application. However, because the FCC informed VoiceStream that its proposed tower may have adverse effects on the local environment and historical properties, VoiceStream requested that its application be removed from the Board of Adjustment's agenda. *See* R.16, Ex.K. Subsequently, VoiceStream held several public meetings to discuss the impact of the tower on the Historic District and on the Riverway. At one of these meetings, which was held on May 24, 2000, VoiceStream presented two alternatives to its one-tower Somerset site proposal. *See* R.16, Ex.N at 2. The first of these alternatives was a two-

tower system with one 250-300 foot tower two miles west of the Riverway and one shorter tower located within the Riverway. *See id.* Also proposed was a four-tower system with three 80-100 foot towers located directly adjacent to Minnesota 95 and another 80-100 foot tower located along Wisconsin 35. *See id.* In a May 31, 2000, memorandum summarizing this meeting, VoiceStream's attorney, Greg Korstad, indicated that either of these multiple-tower alternatives would provide adequate coverage for the area sought to be covered by the Somerset site. *See id.* at 1-2.

VoiceStream worked with the local historical societies, both in Wisconsin and in Minnesota, to determine if the proposed Somerset site would have substantially adverse effects on their respective historical sites. *See* R.16, Ex.O, P. As part of this effort, VoiceStream conducted a "crane test" on June 27, 2000, which consisted of extending a crane to the proposed height at the Somerset site, as well as two other alternative single-tower sites, in order for local residents to get a better idea of the potential visual impact of the proposed tower at each site. *See* R.16, Ex.P. Photos were taken at different locations in the Historic District and in the Riverway and submitted to the Board of Adjustment as exhibits to the SEP. A follow-up meeting was held on August 10, 2000, to discuss the results of the crane test with the local residents, historical society representatives, Park Service representatives and local government officials. *See* R.22 at 15.

The Board of Adjustment scheduled a hearing on September 28, 2000, to consider the Somerset site SEP application. *See* R.16, Ex.S. Included in the record before the Board of Adjustment were several letters from local residents expressing concern over, among other things, the aesthetic impact of the proposed tower. *See* R.16, Ex.U. The record also contained a report written by Jeff Nelson, a consultant

retained by the County to review VoiceStream's SEP application. *See* R.16, Ex.V. Nelson found that there was a gap in VoiceStream's coverage that needed to be filled. *See id.* at 2. He also was unable to find any suitable existing structures upon which antennas could be located to fill the gap. *See id.* He concurred with the position advocated by the Park Service that the tower would indeed be visible from water level in the Riverway and from the Historic District across the river. *See id.* He also opined that VoiceStream had "an economic interest in limiting the number of towers to cover" the area and that VoiceStream could achieve its coverage objectives with multiple shorter towers in lieu of a single 185-foot tower. *Id.* at 3. Finally, Nelson further stated that the proposed tower was a "standard" design, which did not attempt to minimize the adverse visual effects on the Riverway or on the adjacent Historic District. *See id.* Also in the record before the Board of Adjustment was a letter from the Park Service expressing concern about the height and location of the proposed tower, a letter from the Minnesota Historical Society requesting more information on the proposal, a petition signed by some of the neighbors of the Haases in support of the tower, a letter from Marine with a resolution objecting to the proposed tower because of aesthetic considerations, a petition from twelve residents living near the Somerset site opposing the tower for aesthetic and other reasons, as well as several maps and diagrams showing the Somerset site and the proposed tower design. *See* R.16, Ex.T at 1.

At the public hearing, Attorney Korstad testified that there was a gap in VoiceStream's coverage in the area surrounding the Riverway and that VoiceStream needed to fill the gap with a wireless communications facility. He also discussed the two alternative single-tower proposals explored during the crane test and explained why the Somerset site would be the least intrusive of the three

proposals. *See* R.16, Ex.W at 7-8. Attorney Korstad made no mention, however, of the multiple-tower alternatives that VoiceStream had proposed earlier during the May 24, 2000, meeting. *See id.*

Also at the September 28, 2000, hearing, several individuals testified under oath about the proposed tower. The Haases testified in favor of the tower, as did their two sons Jason and Matt. Likewise, Brandon Johnson, a Radio Frequency Engineer, and Dan Menzer, a Senior Manager for Regulatory Affairs, both testified as employees of VoiceStream in favor of the tower. Charles Lederer, a neighbor to the Haases, also testified on behalf of the tower. Speaking against the tower were Paul Roelandt, a Park Service representative, as well as Nancy Nelson, Jack Warren, Glen Mills and Rosemary Pontuti, neighbors of the Haases who raised aesthetic, health, wildlife and property value concerns. *See id.* at 1-28.

Following the hearing, the Board of Adjustment voted unanimously to table the proposal and to require additional information from VoiceStream. R.16, Ex.X at 8. The County Zoning Office sent a letter to VoiceStream detailing the Board of Adjustment's decision. *See* R.16, Ex.Y. Among other requirements, the letter stated that VoiceStream should "provide information on alternative sites with explanations of why they do or do not work for [VoiceStream's] intended purpose." R.16, Ex.Y at ¶ 5. The letter also specifically requested that "a plan be prepared (with a narrative, map and mock-up) that shows more towers at lesser heights to lessen the visual impact on this national scenic area." *Id.* The Board of Adjustment also requested a detailed plan covering "stealth" concealment that would lessen the visual impact of the proposed tower to the Riverway and to the Historic District. *See id.* at ¶ 4. Finally, the Board of Adjustment requested a detailed

response to the concerns raised by Jeff Nelson's report. *See id.* at ¶ 7.

In the months that followed, VoiceStream held another series of public meetings in an attempt to resolve concerns surrounding the visual impact of the proposed tower on the Historic District. Although the record shows continued concern by several members of the community regarding the aesthetic impact of the tower on the Historic District, VoiceStream did succeed in obtaining letters from historical societies on both sides of the river that state that the proposed tower would have "no adverse impact to properties listed or eligible for listing on the National Historic Register" in the area. R.16, Ex.LL at App.D. Likewise, VoiceStream commissioned Pinnacle Engineering, Inc. to prepare an environmental assessment in accordance with 47 C.F.R. § 1.1311. *See* R.16, Ex.LL at 1. This assessment evaluated the environmental effects of the proposed installation in accordance with the requirements of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq. See* R.16, Ex.LL at 1. The assessment concluded that the tower planned for the Somerset site did not "appear to present a significant adverse environmental impact." *Id.* at 10.

VoiceStream representatives also met with Jeff Nelson in an effort to address each of the concerns listed in his September 27, 2000, letter. *See* R.16, Ex.OO at 5. In a meeting on October 9, 2000, Nelson informed VoiceStream that the thrust of his written analysis to the Board of Adjustment "was that VoiceStream should investigate the use of a series of smaller structures to be used in the aggregate rather than one standard tower to meet its coverage objectives." R.23 at ¶ 4; *see also* R.24 at ¶¶ 3-4. Nelson met again with VoiceStream on October 25, 2000, and he once more emphasized the negative visual impact of the single-tower

approach and suggested that VoiceStream investigate alternatives using multiple, shorter structures that would be "less conspicuous and more easily concealed and camouflaged." R.23 at ¶ 5; *see also* R.24 at ¶ 5. Nelson also recommended several existing structures as potential antenna locations. *See* R.16, Ex.OO at 6. Later, on June 20, 2001, Nelson was contacted by Steve Ramberg, the senior VoiceStream radio frequency operator who had conducted a review of alternative locations for placing an antenna. Nelson's conversation with Ramberg led him to conclude that VoiceStream only had considered single-tower alternatives, and had not considered whether an aggregation of sites could be used to meet VoiceStream's coverage objectives. *See* R.23 at ¶ 7.

In a letter dated May 10, 2001, VoiceStream responded to the Board of Adjustment's request for additional information. *See* R.16, Ex.OO. Among other things, VoiceStream explained why the existing structures suggested by Nelson as possible antenna locations would not work using a single-tower approach. However, VoiceSream did not discuss in any meaningful way the feasibility of using a combination of these structures in a multiple-antenna system to achieve its coverage objectives. Nelson later reviewed this letter and concluded that VoiceStream had not investigated the use of multiple, shorter structures, inasmuch as no supporting information had been submitted to the Board of Adjustment that depicted coverage performance from a multi-site coverage solution. *See* R.23 at ¶ 6.

In a letter dated June 20, 2001, the County Zoning Office sent VoiceStream a copy of the staff report sent to the Board of Adjustment for the upcoming hearing on June 28, 2001. This report concluded that VoiceStream had not responded adequately to the Board of Adjustment's request

for additional information regarding alternative stealth designs and had not submitted alternative mock-up plans. The report also set forth concerns about the lack of effort on VoiceStream's part to look into less visually intrusive alternatives to the Somerset site. *See* R.16, Ex.QQ.

Nelson sent a letter to the County Zoning Office on June 25, 2001, in which he stated that VoiceStream had not seriously considered multiple-tower options. R.16, Ex.TT. Ramberg responded to Nelson's conclusion in a memo, also dated June 25, 2001, in which he asserted: "We have as recommended by the County's consultant evaluated whether the service could be accomplished by increasing the number of sites using existing tall structures as antenna locations. We have concluded that it will not [] meet coverage objectives in the riverway area. Because of this, no multiple site configuration is presented." *See* R.26, Ex.UU.

The public hearing originally scheduled for June 28, 2001, was moved, at the request of VoiceStream, to July 26, 2001. R.16, Ex.VV. The record previously before the Board of Adjustment during the September 28, 2000, hearing was supplemented with additional letters from residents opposing and supporting the tower, including letters from the City of Marine, the Town of Somerset, and various local organizations and historical societies. *See* R.16, Ex.XX. Attorney Korstad again testified on behalf of VoiceStream. In particular, he explained that VoiceStream's alternatives for constructing shorter towers were limited because of the County's ordinance prohibiting the construction of towers in the Riverway. *See* R.16, Ex.ZZ at 30-38. Steve Ramberg also testified on VoiceStream's behalf. When asked if he was aware that VoiceStream might be able to locate antennas within the Riverway, Ramberg replied, "No, not to my knowledge." R.16, Ex.ZZ at 44. Ramberg explained that he was told by VoiceStream that

it could not locate antennas in the Riverway because of the local zoning ordinance. *See id.* When asked whether locating towers in the Riverway sounded like a viable option, Ramberg testified: "No, not really" because "we're trying to cover a broad area with as minimal [a] number of towers as we can." *Id.*

Also at the July 26, 2001, hearing, several individuals testified against VoiceStream's proposed tower. Tony Anderson, a superintendent of the Park Service at the St. Croix National Scenic Riverway in St. Croix Falls, testified that VoiceStream's proposed tower would "have a major and drastic impact upon the Riverway" and that less visually intrusive alternatives needed to be pursued. *See id.* at 38. Jill Medland, a planning and compliance specialist with the Park Service, testified that VoiceStream had not adequately explored the alternative of shorter towers with stealth designs. *See id.* at 39. Medland, along with Paul Roelandt, another representative of the Park Service, pointed out that VoiceStream could locate antennas within the Riverway with the permission of the Park Service, and that the Park Service repeatedly had offered to consider granting permission if the overall visual impact on the Riverway would be lessened. *See id.* at 39-40.[2] Jack Warren, a member of the planning commission for the

---

[2]  In a letter dated August 27, 2001, Robert J. Karotko, a superintendent of the Park Service at the St. Croix National Scenic Riverway in St. Croix Falls, described an enclosed right-of-way permit issued to a wireless telecommunications provider for two wireless telecommunications facilities at Rock Creek Park in Washington D.C. *See* R.25, Ex.A. Superintendent Karotko also expressed his willingness to review an application for a telecommunications facility in the Riverway, but emphasized that any proposal could not be in derogation of the values and purposes for which the Riverway was established. *See id.*

City of Marine, also testified in opposition to the proposed tower. He stated that the City of Marine was in favor of utilizing multiple, shorter, more easily concealed towers as a means of minimizing the visual impact on the Riverway; he also indicated that he did not believe such an alternative had been adequately considered. *See id.* at 41. Charles Arneson, a resident of the City of Marine and a member of a committee appointed by the city to work on the tower proposal, further testified that the proposed tower would have an adverse visual impact on the scenic and historic resources of the St. Croix River Valley. *See id.* at 42. At the conclusion of the hearing, the Board conducted an on-site inspection of the Somerset site.

On July 27, 2001, the five-member Board of Adjustment reconvened to vote on VoiceStream's SEP application. The Board of Adjustment voted three-to-two against granting the proposal for the Somerset site. *See* R.16, Ex.AAA at 16. On September 19, 2001, the Board of Adjustment issued a formal written decision, including findings of fact and conclusions of law, denying the application. *See* R.16, Ex.BBB. In its written decision, the Board of Adjustment concluded that "granting [] the request would not be consistent with the spirit and intent of the Zoning Ordinance." *Id.* The Board of Adjustment supported its conclusion with the following findings:

    1.  The 185-foot cell tower would be visible from the Lower St. Croix National Scenic Riverway.

    2.  The applicant has not adequately researched or brought forth information on an alternative site or multiple alternative sites to lessen the visual impact on the Lower St. Croix National Scenic Riverway.

    3.  The National Park Service (NPS) has provided testimony stating that they would work with the applicant

to explore and develop stealth sites within NPS river-way areas.

\* \* \* \*

5.  This tower and this location had tremendous public and agency opposition.

6.  Of any area in St. Croix County, the Lower St. Croix National Scenic Riverway and riverway valley is one of the most scenic areas in the region. This region requires careful wireless communication service facility siting and design to minimize adverse visual effects. This proposal does not minimize adverse visual effects.

7.  The record will indicate the various concerns that the public and agencies had with this application. The various concerns are found in the public testimony and the exhibits brought forth by the public and governmental agencies.

*Id.* at 1-3. In finding number 4, the Board of Adjustment indicated its agreement with the conclusions in the zoning staff report. *See id.*

## B.  District Court Proceedings

Following the County's denial of VoiceStream's request for a SEP to construct its proposed tower, VoiceStream brought this action in the district court under the Telecommunications Act of 1996. It alleged that the County's decision was not supported by substantial evidence as required by 47 U.S.C. § 332(c)(7)(B)(iii) and that the denial has the effect of prohibiting the provision of personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II). The parties filed cross-motions for summary judgment and the district court granted the County's motion. The court held (1) that substantial evidence in the record supported

the County's determination that VoiceStream's proposed telecommunications tower would have an adverse visual impact on the Lower St. Croix National Scenic Riverway and that VoiceStream had not shown the infeasibility of other, less visually intrusive alternatives for closing its coverage gap, and (2) that VoiceStream failed to meet its burden of proof to show that the County's decision effectively prohibited personal wireless services.

## II

## DISCUSSION

### A. Introduction

Congress enacted the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 151 *et seq.*, "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, 56 (1996). Among the technologies addressed by Congress in the TCA was wireless communications services. In regard to this technology, Congress found that "siting and zoning decisions by non-federal units of government" had "created an inconsistent and, at times, conflicting patchwork of requirements" that was inhibiting the deployment of wireless communications services. H.R. Rep. 104-204, at 94 (1995), *reprinted in* 1996 U.S.C.C.A.N. 10, 61. At the same time, Congress recognized that "there are legitimate State and local concerns involved in regulating the siting of such facilities . . . , such as aesthetic values and the costs associated with the use and maintenance of public rights-of-way." *Id.* To address the problems created by local zoning decisions, the House version of the TCA would have given authority to the FCC to regulate directly the siting

of wireless communications towers. The Conference Committee, however, decided against complete federal preemption, opting to "preserve[] the authority of State and local governments over zoning and land use matters except in [] limited circumstances." *See* H.R. Conf. Rep. No. 104-458, at 207-08 (1996). Therefore, § 704(a) of the TCA, 47 U.S.C. § 332(c)(7), strikes a delicate balance between the need for a uniform federal policy and the interests of state and local governments in continuing to regulate the siting of wireless communications facilities. Under that section, state and local governments retain the authority to regulate the siting of wireless telecommunications facilities, but their decisions are subject to certain procedural and substantive limitations. *See* 47 U.S.C. § 332(c)(7).[3] Only two of those

---

[3]  47 U.S.C. § 332(c)(7) provides:

> Preservation of local zoning authority
>
>  (A)  General authority
>
>   Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
>
>  (B)  Limitations
>
>  (i)  The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof—
>
>   (I)   shall not unreasonably discriminate among providers of functionally equivalent services; and
>
>   (II)  shall not prohibit or have the effect of prohibiting the provision of personal wireless services.
>
> (continued...)

limitations are relevant here. First, the County's denial of VoiceStream's permit must be "supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Second, the County's denial of the permit must not "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

## B. Substantial Evidence

VoiceStream contends that the district court erred when it granted summary judgment in favor of the County because the County's decision to deny VoiceStream's SEP

---

[3] (...continued)

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

47 U.S.C. § 332(c)(7).

application was not supported by substantial evidence. According to VoiceStream, it demonstrated to the County that the proposed tower at the Somerset site would not have an adverse visual impact on the area and that the proposal was the only legally and technologically viable alternative available to close the undisputed coverage gap. The County, on the other hand, maintains that the district court properly granted summary judgment in the County's favor because its decision was supported by substantial evidence that VoiceStream's proposed tower would have an adverse visual impact on the extraordinary scenery of the Lower St. Croix National Scenic Riverway and because VoiceStream failed to show the infeasibility of less visually intrusive alternatives for closing the coverage gap.

The TCA requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).[4] "Substantial evidence review under the

---

[4]  VoiceStream does not dispute that the Board of Adjustment's decision was "in writing" for purposes of the TCA; accordingly, we have no occasion to consider the "in writing" requirement of § 332(c)(7)(B)(iii) at this time. *Compare New Par v. City of Saginaw*, 301 F.3d 390, 395 (6th Cir. 2002) ("[F]or a decision by a State or local government or instrumentality thereof denying a request to place, construct, or modify personal wireless service facilities to be 'in writing' . . . , it must (1) be separate from the written record; (2) describe the reasons for the denial; and (3) contain a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the rec-
(continued...)

TCA does not create a substantive federal limitation upon local land use regulatory power." *Southwestern Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 58 (1st Cir. 2001) (internal quotation marks omitted); *see also Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1219 (11th Cir. 2002); *Aegerter v. City of Delafield*, 174 F.3d 886, 890 (7th Cir. 1999); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999). Rather, "[t]he TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable [local] zoning requirements." *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002) (internal quotation marks omitted); *see also Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township*, 181 F.3d 403, 408 (3d Cir. 1999); *Town of Amherst v. Omnipoint Communications Enters., Inc.*, 173 F.3d 9, 16 (1st Cir. 1999). "The substantial evidence test is highly deferential to the local board." *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 627 (1st Cir. 2002). It is the same standard of review used by courts when reviewing the decision of an administrative agency—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *City of Delafield*, 174 F.3d at 889 (internal quotation marks omitted); *see also Town of Kingston*, 303 F.3d at 94; *Troup County*, 296 F.3d at 1218; *Telespectrum, Inc. v. Pub.*

---

[4] (...continued)

ord that supports those reasons."), *and Southwestern Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 60 (1st Cir. 2001) (same), *with AT&T Wireless PCS, Inc. v. City Counsel of City of Virginia Beach*, 155 F.3d 423, 430 (4th Cir. 1998) ("The simple requirement of a 'decision . . . in writing' cannot reasonably be inflated into a requirement of a statement of findings and conclusions, and the reasons or basis therefor.").

*Serv. Comm'n of Kentucky*, 227 F.3d 414, 423 (6th Cir. 2000).
"[T]he party seeking to overturn the local zoning board's
decision has the burden of proving that the decision is not
supported by substantial evidence." *American Tower LP v.
City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002); *see
also Todd*, 244 F.3d at 63; *MetroPCS, Inc. v. City and County
of San Francisco*, 259 F. Supp. 2d 1004, 1009-10 (N.D. Cal.
2003); *Primeco Pers. Communications, Ltd. P'ship v. City of
Mequon*, 242 F. Supp. 2d 567, 575 (E.D. Wis. 2003); *APT
Minneapolis, Inc. v. Eau Claire County*, 80 F. Supp. 2d 1014,
1022 (W.D. Wis. 1999).[5]

In this case, the County concluded that VoiceStream's
request "would not be consistent with the spirit and intent

[5]  As stated in the text, the Eleventh Circuit has held squarely
that the burden is on the party seeking to overturn the decision.
*See American Tower LP v. City of Huntsville*, 295 F.3d 1203, 1207
(11th Cir. 2002). The First Circuit also appears to place the burden
of proof on the party seeking to overturn the decision. *See S.W.
Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 63 (1st Cir. 2001) ("The
'substantial evidence' requirement does nothing more than allow
applicants to overturn denials if they can prove that the denial
lacks adequate evidentiary support in the record."). The Second
and Sixth Circuits have indicated that it is unclear which party
bears the burden of proof and have declined to resolve the issue
because the evidence before the courts was insufficient to sup-
port the denial either way. *See Laurence Wolf Capital Mgmt. v. City
of Ferndale*, Nos. 01-1142, 01-1457, 2003 WL 1875554, at *17 (6th
Cir. Apr. 10, 2003); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d
490, 496-97 (2d Cir. 1999). The district courts are split on the issue,
but several recent cases have held that the burden rests with
the party seeking to overturn the decision. *See, e.g., MetroPCS,
Inc. v. City and County of San Francisco*, 259 F. Supp. 2d 1004,
1009 (N.D. Cal. 2003)*; Primeco Pers. Communications, Ltd. P'ship
v. City of Mequon*, 242 F. Supp. 2d 567, 575 (E.D. Wis. 2003).

of the Zoning Ordinance." *See* R.16, Ex.BBB at 1. One of the stated purposes of the County's Wireless Communication Facilities Ordinance is to "[m]inimize [the] adverse visual effects of wireless communication facilities through careful siting and design standards." *See* R.16, Ex.F. The County specifically found that the proposed "185-foot cell tower would be visible from the Lower St. Croix National Scenic Riverway," that "the Lower St. Croix National Scenic Riverway and riverway valley is one of the most scenic areas in the region," that "[t]his region requires careful wireless communication service facility siting and design to minimize adverse visual effects" and that VoiceStream's proposed tower "does not minimize adverse visual effects." R.16, Ex.BBB at 1-3.

In *City of Delafield*, we stated that "[n]othing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and . . . aesthetic harmony is a prominent goal underlying almost every such code." *City of Delafield*, 174 F.3d at 891. Indeed, every circuit to consider the issue has determined that aesthetics may constitute a valid basis for denial of a wireless permit if substantial evidence of the visual impact of the tower was before the board. *See Troop County*, 296 F.3d at 1219; *Todd*, 244 F.3d at 61; *Pine Grove Township*, 181 F.3d at 408; *AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Bd. of Adjustment*, 172 F.3d 307, 316 (4th Cir. 1999); *Town of Oyster Bay*, 166 F.3d at 495. Of course, a "few generalized expressions of concern with aesthetics," standing alone, cannot serve as substantial evidence on which to base a wireless permit denial. *New Par v. City of Saginaw*, 301 F.3d 390, 398 (6th Cir. 2002) (internal quotation marks omitted); *Troup County*, 296 F.3d at 1219; *Town of Oyster Bay*, 166 F.3d at 496. Because "[f]ew people would argue that telecommunica-

tions towers are aesthetically pleasing," a local zoning board's "aesthetic judgment must be grounded in the specifics of the case." *Todd*, 244 F.3d at 61.

In this case, the district court correctly determined that substantial evidence supported the County's conclusion that the design and location of VoiceStream's tower as proposed would have an adverse visual impact on the Lower St. Croix Riverway and surrounding area. The district court discussed thoroughly the specific aesthetic concerns raised by numerous citizens and organizations in opposition to VoiceStream's proposed tower:

> Although some of the comments from the public consisted of general statements that the tower was an eyesore and would have a negative impact on property values, most of the concerns about aesthetics were focused on the incompatibility of a 185-foot tower on the river bluff extending noticeably above the tree line with the extraordinary scenery of the National Scenic Riverway and with the historic district in the City of Marine on St. Croix. In particular, the National Park Service voiced strong opposition to the tower, asserting that the unspoiled view of the St. Croix River Valley was a unique natural resource that deserved unusual protection. The park service supported its position with maps developed during the crane testing that showed that a tower on the Haase site would be visible from locations up to four miles away on the St. Croix River and Minnesota Highway 95 and from the [City of] Marine on St. Croix Historic District. The tower's visibility from various sites in the City of Marine on St. Croix was confirmed by photographs submitted to the board by local residents.

> Contrary to [VoiceStream's] assertion, the National Park Service was not the only party that opposed the

tower on grounds that it was incompatible with the character and scenery of the St. Croix Riverway. . . . [T]he City of Marine on St. Croix, the St. Croix River Association, the Minnesota-Wisconsin Boundary Area Commission and several members of the public expressed the view that the riverway was a unique scenic resource that would be harmed by [VoiceStream's] proposed tower. Several of these groups and individuals expressed a preference for a multiple-tower approach utilizing towers that were more consistent in height and appearance with existing features in the landscape. This view was supported by zoning board staff, who concluded that the St. Croix Riverway and nearby historic preservation areas such as Marine on St. Croix possessed extraordinary scenic qualities that demanded special consideration for proposed wireless telecommunication service facilities.

R.32 at 41-42.

The County's determination that the proposed tower would adversely impact the aesthetic harmony of the Lower St. Croix Riverway was "grounded in the specifics of the case." *Todd*, 244 F.3d at 61. The decision was not based on speculation or conjecture; the County conducted an on-site investigation, and a map prepared by the Park Service based on VoiceStream's crane test documented that the 185-foot tower would be visible for several miles along the Riverway. Photographs taken during the crane test showed that the proposed tower would predominate the landscape of the bluff overlooking the Riverway. Additionally, Park Service representatives, local residents and various state and local entities, many of whom observed the crane test, testified that VoiceStream's proposed tower would interfere with the unique scenery of the Lower St. Croix Riverway. Based on this evidence, the district court

correctly determined that the County's decision did not violate the substantial evidence requirement of § 332(c)(7)(B)(iii).[6]

## C.  Effective Prohibition

VoiceStream submits that the district court erred when it granted the County's motion for summary judgment because the County's denial of VoiceStream's SEP application had the effect of prohibiting personal wireless services. VoiceStream maintains that it adequately demonstrated that the Somerset site is the only legally and technologically viable alternative to close the undisputed coverage gap. The County, on the other hand, maintains that the district court properly granted summary judgment in its favor because VoiceStream did not meet its burden of proving the absence of other feasible alternatives to fill the coverage gap.

The TCA provides that, in regulating the placement and construction of personal wireless facilities, a state or local government "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Whether a particular zoning

---

[6]  The County's conclusion that VoiceStream "has not adequately researched or brought forth information on an alternative site or multiple alternative sites to lessen the visual impact on the Lower St. Croix National Scenic Riverway," is addressed below in connection with the TCA's anti-prohibition clause. *See* R.16, Ex.BBB at 1. "Unlike the substantial evidence issue, the issue of whether the [County] has prohibited or effectively prohibited the provision of wireless services is determined de novo" by a reviewing court. *Second Generation Props. L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002).

decision violates the TCA's anti-prohibition clause is a question "that a federal district court determines in the first instance without any deference to the [local zoning] board." *National Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002). In resolving this issue, the district court may "require evidence to be presented in court that is outside of the administrative record compiled by the local authority." *Id.* This court reviews de novo the district court's grant of summary judgment to the County. *See id.*

We have not addressed squarely the meaning of the TCA's anti-prohibition clause. *See Aegerter*, 174 F.3d at 890 (holding that the city's decision to deny the provider's request to replace an existing tower was supported by substantial evidence and declining to comment on "how broad the duty is on any given municipal entity to ensure that wireless services remain available" because the provider conceded that it could continue to provide service with the existing tower). Other circuits have determined that the clause "is not restricted to blanket bans on cell towers," and that "[t]he clause may, at times, apply to individual zoning decisions." *Second Generation Props.*, 313 F.3d at 629; *see also 360○ Communications Co. of Charlottesville v. Bd. of Supervisors of Albemarle County*, 211 F.3d 79, 86 (4th Cir. 2000); *APT Pittsburgh Ltd. P'ship v. Penn Township Butler County*, 196 F.3d 469, 479 (3d Cir. 1999); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 640 (2d Cir. 1999); *but see AT&T Wireless PCS, Inc. v. City Council of City of Virginia Beach*, 155 F.3d 423, 427 (4th Cir. 1998) (concluding that the TCA's anti-prohibition clause applies only to "blanket prohibitions" and "general bans or policies," not to individual zoning decisions). Those courts properly have recognized that "[c]onstruing subsection B(i)(II) to apply only to general bans would lead to the conclusion that, in the absence of an explicit anti-tower policy, a court

would have to wait for a series of denied applications before it could step in and force a local government to end its illegal boycott of personal wireless services." *Willoth*, 176 F.3d at 640-41.

Although an individual zoning decision is capable of violating the anti-prohibition clause and the provider need not show "a consistent pattern of denials or evidence of express hostility to personal wireless facilities, . . . it is necessary for the provider to show more than that it was denied an opportunity to fill a gap in its service system." *Penn Township*, 196 F.3d at 480; *see also Albemarle*, 211 F.3d at 86 ("[C]ase-by-case denials of permits for particular sites cannot, without more, be construed as a denial of wireless services.").[7] The First Circuit has held that the provider carries the "heavy" burden to show "not just that this application has been rejected but that fur-ther reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Town of Pelham*, 313 F.3d at 629 (quoting *Town of Amherst*, 173 F.3d at 14); *see also Plainville*, 297 F.3d at 20. Under this standard, the pro-vider must show that its "existing application is the only feasible plan" and that "there are no other potential solu-tions to the purported problem." *Town of Pelham*, 313 F.3d

---

[7] In order to establish a violation of the TCA's anti-prohibition clause, the service provider must first show that its proposed facility will close a "significant gap" in coverage. *See Omnipoint Communications Enters., L.P. v. Zoning Hearing Bd. of Easttown Township*, 331 F.3d 386, 399-400 (3d Cir. 2003); *Second Generation Props.*, 313 F.3d at 631-32; *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999). In this case, however, it is undis-puted that there is a significant gap in coverage that needs to be closed by a telecommunications facility. Accordingly, we have no occasion to consider what constitutes a significant gap in coverage.

at 630, 635; *see also Albemarle*, 211 F.3d at 86-87 (stating that, "conceptually, if wireless service could feasibly be provided from only one site, a denial of a permit for a facility at that site could amount to a prohibition of wireless services, in violation of (B)(i)(II)," but noting that such a situation is "unlikely in the real world").[8] We agree with the First

---

[8] The Third Circuit has held that the provider must show "that the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve." *APT Pittsburgh Ltd. P'ship v. Penn Township Butler County*, 196 F.3d 469, 480 (3d Cir. 1999). In order to make such a showing, the provider must demonstrate that "a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc." *Id.* Consistent with the Third Circuit's approach, the Second Circuit had held that "[a] local government may reject an application for construction of a wireless service facility in an under-served area without thereby prohibiting personal wireless services if the service gap can be closed by less intrusive means." *Willoth*, 176 F.3d at 643.

The Fourth Circuit has criticized the "interpretive rule" of the Second and Third Circuits on the grounds that it unduly limits the discretion of the local zoning entity and that the statutory question requires no additional formulation:

> This interpretive rule effectively creates a presumption, shifting the burden of production to the local government to explain its reason for denying such an application. But, as an interpretation of the Telecommunications Act, we believe this rule reads too much into the Act, unduly limiting what is essentially a fact-bound inquiry. A community could rationally reject the least intrusive proposal in favor
> (continued...)

Circuit's formulation of the statutory requirement and hold that, so long as the service provider has not investigated thoroughly the possibility of other viable alternatives, the denial of an individual permit does not "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C § 332(c)(7)(B)(i)(II).

The district court correctly determined that VoiceStream failed to meet "its heavy burden of showing that its proposal to build a 185-foot tower on the Haase property is the only feasible plan for closing the gap in its coverage along Highways 95 and 35 and the St. Croix River." R.32 at 29. Although several alternatives to the Somerset site were suggested by both the County and VoiceStream, these

---

[8]  (...continued)

of a more intrusive proposal that provides better service or that better promotes commercial goals of the community.

Even if we were to apply the rule formulated by the Second and Third Circuits, determinations about what constitutes the "least intrusive means" and "a significant gap" in services, would, we believe, quickly devolve into the broader inquiry indicated by the language of the statute: "Does the denial of a permit for a particular site have the effect of prohibiting wireless services?" We believe that this statutory question requires no additional formulation and can best be answered through the case-by-case analysis that the Act anticipates.

*360° Communications Co. of Charlottesville v. Bd. of Supervisors of Albemarle County*, 211 F.3d 79, 87 (4th Cir. 2000). We share much of the Fourth Circuit's concern regarding the "interpretive rule" expounded by the Second and Third Circuits and agree that the proper inquiry is the one indicated by the statute: "Does the denial of a permit for a particular site have the effect of prohibiting wireless services?" *Id.*

alternatives were not pursued such that VoiceStream thoroughly investigated the viability of other alternatives. Although VoiceStream did investigate, at least partially, two single-tower alternatives to the Somerset site in its crane test, there is no evidence in the record to indicate that VoiceStream made a significant effort to investigate any multiple-tower alternatives despite the repeated requests of the Board of Adjustment. In particular, there is no evidence in the record to indicate that VoiceStream pursued adequately either of the multiple-tower alternatives that it mentioned during the May 24, 2000, meeting. *See* R.16, Ex.N at 2. The first of these multiple-tower alternatives included a tower in the Riverway. VoiceStream argues that such a placement is legally impermissible. It has not explained, however, why the repeated offers of both the Park Service and the County to consider favorably such an alternative would not permit adequate compliance. Moreover, the second multiple-tower alternative did not require the placement of any towers in the Riverway. Rather, this second alternative consisted solely of a series of towers along Minnesota 95 and Wisconsin 35. *See id.* In sum, VoiceStream indicated that both of these multiple-tower configurations might be viable alternatives to the Somerset site. Consequently, it was obligated to undertake further investigation to determine the feasability of each.

After the first hearing, the Board of Adjustment requested that VoiceStream "provide information on alternative sites with explanations of why they do or do not work for [VoiceStream's] intended purpose." R.16, Ex.Y at ¶ 5.[9]

---

[9] The Board of Adjustment's request for additional evidence was proper under the County's Ordinance, which provides that

(continued...)

In particular, the Board of Adjustment requested that "a plan be prepared (with a narrative, map and mock-up) that shows more towers at lesser heights to lessen the visual impact on this national scenic area." *Id.* Later, in a meeting held on October 9, 2000, Nelson reiterated that the Board of Adjustment wanted VoiceStream to investigate the use of a "series of smaller structures to be used in the aggregate rather than one standard tower to meet its coverage objectives." R.23 at ¶ 4; *see also* R.24 at ¶¶ 3-4. Nelson met again with VoiceStream on October 25, 2000, and once more emphasized the negative visual impact of the single-tower approach and suggested that VoiceStream investigate alternatives using multiple, shorter structures that would be "less conspicuous and more easily concealed and camouflaged." R.23 at ¶ 5; *see also* R.24 at ¶ 5.

VoiceStream responded to the Board of Adjustment's request by a May 10, 2001, letter in which it stated that it had "already applied stealth technology and reconfigured its project to improve aesthetics under the current proposal," and that "VoiceStream engineers have evaluated alternative means to meet the coverage objective using shorter towers." *See* R.16, Ex.OO at 4. VoiceStream went on to explain that the zoning ordinances along the river are very restrictive and the topography is difficult because of the undulating terrain. *See id.* VoiceStream then concluded that the height of the proposed Somerset site tow-

---

[9] (...continued)
"[t]he Zoning Administrator or Board of Adjustment may, at his/her or its discretion, require visual impact demonstrations, including mock-ups and/or photo montages; screening and painting plans; network maps; alternative site analysis; lists of other nearby wireless communication facilities; or facility design alternatives for the proposed facilities." R.16, Ex.F at 6.

er "is the minimum that will provide acceptable coverage within the river area." *Id.*

Shortly after reviewing this response, the County Zoning Office sent a staff report to VoiceStream in which it concluded that VoiceStream had not adequately responded to the Board of Adjustment's request for information regarding multiple-tower alternatives. Specifically, the staff report stated that "[i]t is unclear[] to what extent other sites were actually considered[,] investigated[, or] analyzed. Alternative mock-up plans have not been provided." *See* R.20, Ex.7A at 2. Later, on June 20, 2001, Nelson was contacted by Steve Ramberg, the senior VoiceStream radio frequency operator who had conducted a review of alternative locations for constructing a tower. Nelson's conversation with Ramberg led him to conclude that VoiceStream had only considered single-tower alternatives, and had not considered whether an aggregation of sites could be used to meet VoiceStream's coverage objectives. *See* R.23 at ¶ 7. In the intervening weeks between Voice-Stream's receipt of the staff report and the second hearing, VoiceStream failed to submit any additional information to the Board of Adjustment regarding multiple-tower configurations as alternatives to the Somerset site proposal. Based on this incomplete response, the Board of Adjustment determined that VoiceStream had "not adequately researched or brought forth information on an alternative site or multiple alternative sites to lessen the visual impact on the Lower St. Croix National Scenic Riverway." See R.16, Ex.BBB at 1.

The disparity in substance between what the Board of Adjustment received from VoiceStream on the Somerset site and what they received on multiple-tower alternatives is telling. Although VoiceStream provided extensive maps, diagrams, environmental assessments and historic assess-

ments for the Somerset site, VoiceStream provided no maps, diagrams, or any type of assessment on multiple-tower configurations as alternative sites. Instead, the record contains only conclusory statements. Such conclusory statements by the applicant, without more, are insufficient to establish that the applicant has exhausted thoroughly the possibility of other viable alternatives. VoiceStream's conclusory statements that multiple-tower alternatives are not feasible are insufficient to prove that the Board of Adjustment's denial of its Somerset site application "prohibit[s] or ha[s] the effect of prohibiting the provision of personal wireless services." 47 U.S.C § 332(c)(7)(B)(i)(II).

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*